

1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  DARREN J. ROBBINS (168593)
   DAVID C. WALTON (167268)
3  CATHERINE J. KOWALEWSKI (216665)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone:  619/231-1058
5  619/231-7423 (fax)
   darrenr@rgrdlaw.com
6  davew@rgrdlaw.com
   katek@rgrdlaw.com
7
   Attorneys for Plaintiff
8
   [Additional counsel appear on signature page.]
9

10            UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12                   SOUTHERN DIVISION

13  RICHARD GAMMEL, Individually and )   **VIA FAX**
    on Behalf of All Others Similarly )
14  Situated,                         )   No.   **SACV11-01404 AG (RNBx)**
                                      )
15                     Plaintiff,     )   CLASS ACTION
                                      )
16        vs.                         )   COMPLAINT FOR VIOLATION OF
                                      )   THE FEDERAL SECURITIES LAWS
17  HEWLETT-PACKARD COMPANY,          )
    LEO APOTHEKER and CATHERINE       )
18  A. LESJAK,                        )
                                      )
19                     Defendants.    )   DEMAND FOR JURY TRIAL
20  _____  )

21

22

23

24

25

26

27

28

**JURISDICTION AND VENUE**

1.     Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act").  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

2.     Venue is proper in this district pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this district.

3.     Hewlett-Packard Company has operations in this district, including maintaining offices at 2125 E. Katella Avenue, Anaheim, California 92806, and at 15355 Barranca Parkway, Irvine, California 92618.  Certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this district.

4.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**INTRODUCTION**

5.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Hewlett-Packard Company ("HP" or the "Company") between November 22, 2010 and August 18, 2011, inclusive (the "Class Period"), against HP and certain of its officers and/or directors for violations of the 1934 Act.

6.     HP is a provider of products, technologies, software, solutions and services to individual consumers, small- and medium-sized businesses and large enterprises, including customers in the government, health and education sectors.

7.     During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.  As a

result of defendants' false statements, HP's stock traded at artificially inflated prices during the Class Period, reaching a high of $48.99 per share on February 16, 2011.

8.    HP is the leading provider of commercial and consumer personal computers ("PCs") through its Personal Services Group ("PSG") segment, commanding nearly 20% of the PC market worldwide. The PSG segment is HP's largest business segment from a revenue perspective, generating over 30% of HP's revenues. In July 2010, HP completed its acquisition of Palm Inc., a provider of smartphones powered by the Palm webOS mobile operating system, for $1.2 billion. Palm was failing at the time of the acquisition. HP's primary motive for the acquisition was to purchase webOS and "to double down on webOS," with the Palm acquisition being portrayed as a game changing event.

9.    During the Class Period, defendants highlighted HP's ownership of both hardware and software, which differentiated the Company from other high tech companies, as a defining aspect of the Company's value proposition, enabling the Company's business model to benefit from scale and leadership in its core businesses. Defendants further represented that webOS, HP's crown jewel from the Palm acquisition, was going to play an integral role in the Company's strategy going forward, including running on HP's new TouchPad tablet PC as well as on all of the Company's PCs by 2012. Defendants further reconfirmed the strategic importance of PCs to the Company.

10.    On August 18, 2011, HP issued a press release announcing disappointing third quarter fiscal 2011 financial results, as well as a major change of direction for the Company.[1] The Company reported net earnings of $1.9 billion, or $0.93 diluted earnings per share ("EPS), and net revenue of $31.2 billion for the third quarter ended July 31, 2011. The Company additionally issued revised guidance for fiscal year

---

[1]    HP's fiscal year ends October 31.

2011, reducing its revenue guidance to a range of $127.2 to $127.6 billion, versus previous guidance of $129 to $130 billion, and its diluted EPS guidance to a range of $3.59 to $3.70 per share, versus previous guidance of at least $4.27 per share.

11.   HP further announced several major shifts in its long-term business model.  First, it was purchasing enterprise content management and search vendor Autonomy Corporation plc for $10.3 billion, agreeing to pay a 64% premium for the company over its prior closing day price.  Second, the Company announced it was exploring strategic alternatives for its PSG segment, including potentially selling or spinning off its profitable PC division.  Third, the Company announced that it "will discontinue operations for webOS devices, specifically the TouchPad and webOS phones."

12.   As news began to leak into the market, on August 18, 2011, HP's stock declined $1.88 per share, to close at $29.51 per share, a one-day decline of nearly 6% on volume of over 96 million shares.  The next day, HP's stock collapsed as the market fully digested the news of the Company's dismal results and outlook and the serious changes in its strategic vision.  On August 19, 2011, HP's stock price plummeted to its lowest level in 6 years, trading as low as $22.75 per share before closing at $23.60.  This represented a decline of $5.91 per share, or 20%, on volume of 129 million shares.  This was the largest one-day decline in HP's history since the Black Monday stock market crash of October 1987.

13.   On August 19, 2011, CRN published an article entitled "HP Partners Startled by TouchPad's Demise, Uncertain WebOS Future."  The article provided in part:

> Chris Barnes, vice president of research and solutions development at Gap Intelligence, a San Diego-based research firm that follows HP, wonders if the HP brass really believed the WebOS talking points. "WebOS was such a linchpin of the company's overarching strategy; it was the virtual glue that tied together phones, PCs, tablets,

printers," Barnes said. "It really makes you wonder whether HP's senior leadership ever really believed its own story about developing its own self-supporting ecosystem, vis-a-vis Apple. *[It] sounds more like they were dishing out the Kool-Aid but secretly drinking iced tea*."

14.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    HP's business model was not working. The Company was unable to leverage its extensive portfolio and scale of products and services in a strategically beneficial manner.

(b)    WebOS, the TouchPad and the PC business were not central to HP's business model and webOS would not be integrated across the Company's entire product line.

(c)    The TouchPad hardware was inefficient, limiting the degree of effectiveness of the webOS operating system. In fact, webOS operated twice as fast when loaded onto Apple's iPad 2 tablet compared to the TouchPad.

(d)    Based on the foregoing, defendants lacked a reasonable basis for their positive statements about HP's turnaround, revenue growth rates, market share, new product introductions, diluted EPS, and the Company's ability to deliver upon its long-term growth model.

15.    As a result of defendants' false statements, HP stock traded at artificially inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 52% from their Class Period high.

## PARTIES

16.    Plaintiff Richard Gammel purchased the common stock of HP during the Class Period as set forth in the attached certification and was damaged as the result of defendants' wrongdoing as alleged in this complaint.

17.     Defendant HP is a provider of products, technologies, software, solutions and services to individual consumers, small- and medium-sized businesses and large enterprises, including customers in the government, health and education sectors. HP's principal executive offices are located at 3000 Hanover Street, Palo Alto, California 94304.

18.     Defendant Léo Apotheker ("Apotheker") is, and at all relevant times was, the Company's President, Chief Executive Officer ("CEO") and a director.

19.     Defendant Catherine A. Lesjak ("Lesjak") is, and at all relevant times was, the Company's Chief Financial Officer ("CFO") and Executive Vice President. During the Class Period, Lesjak reaped over $2.2 million in insider trader proceeds by selling 51,518 shares of her HP stock at artificially inflated prices.

20.     Defendants Apotheker and Lesjak (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of HP's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

21.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about HP. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of HP common

stock was a success, as it: (i) deceived the investing public regarding HP's prospects and business; (ii) artificially inflated the price of HP common stock; and (iii) caused plaintiff and other members of the Class to purchase HP common stock at inflated prices.

## BACKGROUND

22.    HP offers various products, technologies, software, solutions, and services to individual consumers and small- and medium-sized businesses, as well as to the government, health, and education sectors worldwide. The Company's Services segment provides consulting, outsourcing, and technology services to infrastructure, applications, and business process domains. Its Enterprise Storage and Servers segment offers storage and server products. This segment provides industry standard servers, business critical systems, and storage works offerings. The Company's HP Software segment provides enterprise IT management solutions, information management and business intelligence solutions, and communications and media solutions. Its PSG segment offers commercial PCs, consumer PCs, workstations, handheld computing devices, calculators and other related accessories, and software and services for the commercial and consumer markets. The Company's Imaging and Printing Group segment provides consumer and commercial printer hardware, printing supplies, printing media, and scanning devices, such as inkjet and Web solutions, laserjet and enterprise solutions, managed enterprise solutions, graphics solutions, and printer supplies.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

23.    On November 22, 2010, HP issued a press release announcing its fourth quarter and fiscal year 2010 financial results. The Company reported net income of $2.5 billion, or $1.10 diluted EPS, and net revenue of $33.3 billion for the fourth fiscal quarter ended October 31, 2010. Additionally, the Company reported fiscal year 2010 net revenue of $126 billion. The Company provided guidance for its first quarter of

1   fiscal 2011 of revenue in the range of $32.8 to $33.0 billion and diluted EPS in the

2   range of $1.06 to $1.08 per share.  The Company further provided guidance for the

3   full year fiscal 2011 of revenue in the range of $132 to $133.5 billion, and diluted EPS

4   in the range of $4.42 to $4.52 per share.  The release stated in part:

5           "HP proved once again that it is able to execute given its market

6       strengths and technology leadership," said Léo Apotheker, HP president

7       and chief executive officer. "I have seen firsthand that we have talented

8       people who are focused on delivering value for our customers. Our

9       market opportunity is vast, and I am confident that we will extend our

10      leadership into the future."

11      24.    After releasing its fourth quarter fiscal 2010 financial results on

12  November 22, 2010, HP hosted a conference call with investors, media representatives

13  and analysts, during which defendant Apotheker represented the following:

14      HP has many strengths, and it's actually a formidable Company.  To

15      name just a few of these strengths, I'd like to say the breadth of our

16      technology portfolio, our scale, our people, our customer relationships,

17      and our operational excellence.  I do believe that our greatest strength is

18      actually our opportunities.  ***Given our size and breadth, we have a***

19      ***unique position in the market to expand, to do way more business in***

20      ***emerging markets, to become more of a solution provider for our***

21      ***customers, and to leverage our own technology better across the entire***

22      ***Company***.  And you should bear in mind, that our technology trends are

23      morphing, and they are morphing rapidly.

24          We, at HP, have the opportunity to grow our leadership position.

25      We're addressing the cloud in many ways, an example, converged

26      infrastructure, and we are addressing mobility with webOS.  So all of

27      these are fantastic opportunities that we are looking at.

28                      *       *       *

1     We are the only Company in this industry that is equally good on

2    the Consumer side, and on the Enterprise side.  And if we manage, and

3    we will work very hard to do that, to leverage the rapid innovation cycle

4    that occurs on the Consumer side, basically the Enterprise, make it

5    (inaudible) more scalable, and then use that to our benefit, I think that

6    will give us an immense competitive advantage, which is one of the

7    reasons why we need to spend a little bit more money on R&D, and one

8    of the reasons why we need to invest into our sales force, so we can

9    bring all of this to bear, in a very effective way to the market.  So net-

10    net, I'm very optimistic.

11   25. On February 9, 2011, *Bloomberg* issued an article entitled "HP Unveils

12 Palm-Based Tablet Computer, Smartphones," which stated in part:

13    Hewlett-Packard Co. unveiled a tablet computer called the TouchPad in

14    a bid to gain a foothold in the market for handheld computers, and said

15    the product's software, acquired in last year's purchase of Palm Inc., will

16    run on personal computers this year.

17    HP, the world's largest maker of PCs, showed off the TouchPad

18    and smartphones dubbed Veer and Pre 3 at an event in San Francisco

19    today. The company will deliver PCs and printers running WebOS,

20    originally designed for touch-screen devices, to attract more software

21    developers to the platform and expand HP's market, Palm chief Jon

22    Rubinstein said in an interview.

23    "That's going to have a huge influence on the installed base,"

24    Rubinstein said. "Our long-term goal is to deliver a connected

25    experience to all of our customers. You get a unified experience across

26    all your devices."

27   26. On February 16, 2011, HP's stock reached its Class Period high, closing

28 at $48.99 per share.

27.    On February 22, 2011, HP issued a press release announcing its first fiscal quarter 2011 financial results.  The Company reported net earnings of $2.6 billion, or $1.17 diluted EPS, and net revenue of $32.3 billion for the first quarter ended January 31, 2011.  The Company provided guidance for its second quarter of fiscal 2011 of revenue in the range of $31.4 to $31.6 billion, and diluted EPS in the range of $0.99 to $1.01 per share.  The Company further provided revised guidance for fiscal 2011 of revenue in the range of $130 to $131.5 billion, and diluted EPS in the range of $4.46 to $4.54 per share.  The release stated in part:

> "I'm pleased with our EPS and margin expansion during the quarter.  Going forward, we have the opportunity to further capitalize on our customers' demands for higher value-added solutions," said Léo Apotheker, HP president and chief executive officer.  "HP has a powerful portfolio, including exciting, recently announced cloud and connectivity offerings.  We are focused on leveraging these strengths to extend our leadership and accelerate growth."

28.    After releasing its first quarter fiscal 2011 financial results on February 22, 2011, HP hosted a conference call with investors, media representatives and analysts, during which defendants represented the following:

> [LESJAK:] *[I]n terms of the guidance, there is no question that we are being prudent and we're remaining cautious about the environment for consumer PCs.*  There's – I mentioned that earlier. In terms of the second half of the year, the reason why you see better than normal seasonality, half over half, is that we do expect to continue to recover, that in PSG, especially in China.  We also expect improvement in the short-term signings based on the actions that we're taking in the services space.  *And finally, in the second half of the year, we'll also benefit from the launch of our new webOS family of products.*  And so I think that, that just shows what happens in the second half.

1            *      *      *

2        [APOTHEKER:] Let me maybe add one comment to what

3    Cathie has said. *We have been looking very hard at our forecast and I*

4    *can just confirm that we are very confident in our ability to deliver the*

5    *updated fiscal year '11 outlook*. It's beyond the points that Cathie has

6    already made. We see strength in our other businesses and we have

7    scrubbed these numbers long and hard and we believe that these are the

8    right numbers.

9        29.    On March 1, 2011, HP participated in a Morgan Stanley Technology,

10   Media & Telecom Conference, during which defendant Lesjak represented the

11   following:

12        *I think it's important for you all to understand that we have a lot*

13        *of confidence in our ability to deliver our outlook for fiscal 2011*. In

14        Q1 we grew revenue 4%. We grew earnings per share 27%. We grew

15        cash flow from operations 28%.

16        So we know how to manage this business in a variety of revenue

17        environments. And I think that's really important.

18        Our model's in tact, we've got the operational discipline to

19        continue to expand margins, operating margins kind of year over year. I

20        think that it's important when you think about the guidance we have

21        provided, we did take revenue down as you know $2 billion for the fiscal

22        year.

23        Again, it's roughly three quarters from PSG and about a quarter

24        from services. *Frankly if we didn't have confidence in that revenue,*

25        *we would've taken revenue down further*. The difference to you all of

26        $2 billion or $2.5 billion is just not meaningful. So at the end of the day,

27        *we have the confidence in the revenue outlook we provided*.

28

30.    On March 14, 2011, HP hosted an analyst conference call wherein defendant Apotheker represented the following:

At HP, our vision is to provide seamless, secure, context-aware experiences for a connected world, everybody on.  For those who know me, my passion is using technology to help customers succeed. The primary reason I came to HP is that I recognized a remarkable opportunity for this company to shape the future of information technology and deliver unprecedented value for our customers.

*    *    *

*We have the industry's best and broadest portfolio, spanning servers, networking, storage, software, outsourcing, application, and consulting services, desktops, notebooks, tablets, and printers and I'm not even being exhaustive*.  We have market leadership in virtually every category where we compete in from the consumer to the enterprise.  Our reach and scale are unmatched and we leverage it with the products we ship and the companies we acquire; 3Com and 3PAR are great examples, and HP is one of the world's most powerful brands with a reputation that opens doors in any market around the world.

Together, these efforts add up to an incredible opportunity for HP and a compelling value proposition for our customers, shareholders, and employees.  Yes, HP is strong, but we also recognize that the world around us is changing faster than ever.  Powerful trends, like consumerization, cloud computing, and connectivity are redefining the way people live, businesses operate, and the way the world works. There is an expanding relationship between people and information. Your paradigm of one person with separate consumer and professional lives is over. People want a seamless, secure, context-aware experience at home, at work, at play, or on the road.

- 11 -

1                                    *       *       *

2           And as you move up to devices, we're also extremely powerful.

3    HP ships two PCs and two printers a second. ***Our number one market***

4    ***position in printers, desktops and notebooks gives us an enormous***

5    ***installed base which continues to grow. The fact is people like working***

6    ***on PCs and that isn't going to go away***. And people like and people

7    need to print, just look at the fast-growing geographies, like Brazil, as

8    they come online and join the connected world, they can jump into any

9    form factor and they do, including PCs and printers. They are in fact the

10   fastest growing market for our connected devices so far.

11          ***So, traditional technology is something we know, where we***

12   ***compete and win, where we know how to partner, where we create a lot***

13   ***of value and we will continue to enhance our core capabilities to***

14   ***strengthen our positions***. And all of this is of course important, it is the

15   core of our business, but just as important is how our assets, our current

16   assets position us for the future of technology to deliver the seamless,

17   secure, context-aware experiences for the connected world. Because,

18   just as the forces of cloud and connectivity are changing the model for

19   people's relationships to information, beneath that is a changing model

20   of technology, architecture, delivery and consumption.

21          31.    Also on March 14, 2011, HP hosted a press conference for media

22   representatives during which defendant Apotheker represented the following:

23          So ***webOS is an unbelievably attractive and stunning technology***.

24   The devices we have been able to put on display on February 9 have in

25   themselves a certain set of characteristics that make them unique. ***There***

26   ***is interconnectivity, the fact that they are seamless, they connect***

27   ***seamlessly to each other, and some of the other technology features of***

28   ***webOS make it into an outstanding web operating system***.

*So we will be shipping this, first of all, on the dedicated devices, smartphones and the tablet.* The Touch, our tablet, will come out – the Touch pad will come out in June and from that day onwards there will be wave after wave of technology coming out to support the webOS platform.

There will be a beta version for webOS running on a browser on PCs available at the end of the year and you will see us putting webOS on the (inaudible) technology on PCs, on Windows PCs I should add, starting from that point onwards. And we hope to reach 100 million devices a year.

*We will put the same technology on our printers. We will put them on PCs. We will put them on touch pads. We will put them on smartphones so you will see this to become a very massive, very broad platform.*

32.     On May 17, 2011, HP issued a press release announcing its second quarter fiscal 2011 financial results. The Company reported net earnings of $2.3 billion, or $1.05 diluted EPS, and net revenue of $31.6 billion for the second quarter ended April 30, 2011. The Company provided guidance for its third quarter of fiscal 2011 of revenue in the range of $31.1 to $31.3 billion, and diluted EPS in the range of approximately $0.90 per share. The Company further provided revised guidance for fiscal 2011 of revenue in the range of $129 to $130 billion, and diluted EPS in the range of at least $4.27 per share. The release stated in part:

"HP executed well and delivered a solid quarter," said Léo Apotheker, HP president and chief executive officer. "Our enterprise strategy, with services at its core, is focused on higher value-added solutions. Today we are accelerating our efforts to align our services business model to our long-term strategy to deliver unprecedented value to our customers and a better return for our shareholders."

33.    After releasing its second quarter fiscal 2011 financial results on May 17, 2011, HP hosted a conference call with investors, media representatives and analysts, during which defendant Apotheker represented the following:

[ANALYST:] Leo, you talked in your opening remarks about companies that will fail because they protect legacy businesses. And with two guidance resets in a row, is it time, in your view, for HP to reconsider whether you really need to participate in some of the businesses that are dragging down performance? Or do you think you can invest fast enough in new growth segments to offset declines that we are seeing like in PCs right now?

. . . [APOTHEKER:] At HP, we do a high (inaudible) portfolio review to assess the performance of each one of our businesses. We assess these businesses according to their contribution to the business and their contribution to our strategy and the value it can generate to our customers.

It's interesting that you point out PCs. If you look at the performance of PCs, it has a two-phased approach and a two-phased execution. *On the one hand, on the commercial side, we see a continuous demand for PCs, 12% growth*. Again, we are the market leader in this business. And we see some weakness on the consumer side.

We believe that we have a great strategy to execute towards our connectivity approach, and we are very excited about our TouchPads coming out in particular in the summer. *And as we all believe that there will be a convergence of these different form factors over time – TouchPads, PCs, et cetera, and in particular, notebooks – we believe this is a great opportunity for HP to participate in this*. Of course we will continue to assess the value of each element in the portfolio as we

- 14 -

1  continue to look at our business, but right now, I believe we have a

2  balanced portfolio.

3      34.    On June 2, 2011, HP participated at a Sanford C. Bernstein & Co.

4  Strategic Decisions Conference, wherein defendant Apotheker represented the

5  following:

6      [APOTHEKER:]  So the good news on the PC business is the

7  commercial side of the house, or the non-consumer side.  That business

8  is growing double-digit, continues to grow double-digit, is doing really

9  well.

10            *      *      *

11      We see some trends affecting the PC business. Some people talk

12  about the tablet effect.  Some other people are talking about the

13  economic impact.  I think both are a little bit impacting the consumer.  I

14  believe, over time, there are some really interesting opportunities that are

15  opening up that didn't exist in the PC business in the past, which is to

16  create, again, innovation in the PC industry.

17            *      *      *

18      ***The other thing we are doing really well on the PSG side of the***

19  ***house is webOS.  So webOS is ready for prime time.  It's now out on a***

20  ***small phone, the Veer.  And it will be out on the format of the tablet by***

21  ***the end of June/early July.  And it will go into distribution then.  We***

22  ***are all about webOS***.  We are more than about this with the other form

23  factor. And I am happy to reconfirm that webOS will be available on

24  PCs, on top of Windows, which creates a whole new market dynamic for

25      [ANALYST:]  Do you have a date for that? webOS on the PC?

26      [APOTHEKER:]  ***2012***.  I know there are 12 months in 2012,

27  even in Germany. ***And then we have – and we are going to put webOS***

28  ***also on printers.  So we can create the kind of a platform of about 100***

1     ***million, 110 million devices a year***.  And by the way, we won't shy

2     away from licensing webOS to others if that opportunity arises.

3         35.    On August 17, 2011, HP's stock closed at $31.39 per share.

4         36.    Then, on August 18, 2011, HP issued a press release announcing

5     disappointing third quarter fiscal 2011 financial results, as well as a major change of

6     direction for the Company.  The Company reported net earnings of $1.9 billion, or

7     $0.93 diluted EPS, and net revenue of $31.2 billion for the third quarter ended July 31,

8     2011.  The Company additionally issued revised guidance for fiscal year 2011, once

9     again reducing its revenue guidance, this time to a range of $127.2 to $127.6 billion,

10    versus previous guidance of $129 to $130 billion, and its diluted EPS guidance to a

11    range of $3.59 to $3.70 per share, versus previous guidance of at least $4.27 per share.

12    HP further announced several important shifts in its long-term business model.  First,

13    it was purchasing enterprise content management and search vendor Autonomy

14    Corporation for $10.3 billion, agreeing to pay a 64% premium for the company over

15    its prior closing day price.  Second, the Company announced it was exploring strategic

16    alternatives for its PSG segment, including potentially selling or spinning off its

17    profitable PC division.  Third, the Company announced that it "will discontinue

18    operations for webOS devices, specifically the TouchPad and webOS phones."

19        37.    As news began to leak into the market, on August 18, 2011, HP's stock

20    declined $1.88 per share, to close at $29.51 per share, a one-day decline of nearly 6%

21    on volume of over 96 million shares.  The next day, HP's stock collapsed as the

22    market fully digested the news of the Company's dismal results and outlook and the

23    serious changes in its strategic vision.  On August 19, 2011, HP's stock price

24    plummeted to its lowest level in 6 years, trading as low as $22.75 per share before

25    closing at $23.60.  This represented a decline of $5.91 per share, or 20%, on volume

26    of 129 million shares.  This was the largest one-day decline in HP's history since the

27    Black Monday stock market crash of October 1987.

28

38.     On August 19, 2011, CRN issued an article entitled "HP Partners Startled by TouchPad's Demise, Uncertain WebOS Future."  The article provided in part:

> Chris Barnes, vice president of research and solutions development at Gap Intelligence, a San Diego-based research firm that follows HP, wonders if the HP brass really believed the WebOS talking points. "WebOS was such a linchpin of the company's overarching strategy; it was the virtual glue that tied together phones, PCs, tablets, printers," Barnes said. "It really makes you wonder whether HP's senior leadership ever really believed its own story about developing its own self-supporting ecosystem, vis-a-vis Apple. *[It] sounds more like they were dishing out the Kool-Aid but secretly drinking iced tea.*"

39.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     HP's business model was not working.  The Company was unable to leverage its extensive portfolio and scale of products and services in a strategically beneficial manner.

(b)     WebOS, the TouchPad and the PC business were not central to HP's business model and webOS would not be integrated across the Company's entire product line.

(c)     The TouchPad hardware was inefficient, limiting the degree of effectiveness of the webOS operating system.  In fact, webOS operated twice as fast when loaded onto Apple's iPad 2 tablet compared to the TouchPad.

(d)     Based on the foregoing, defendants lacked a reasonable basis for their positive statements about HP's turnaround, revenue growth rates, market share, new product introductions, diluted EPS, and the Company's ability to deliver upon its long-term growth model.

40.     As a result of defendants' false statements, HP stock traded at artificially inflated levels during the Class Period.  However, after the above revelations seeped

1   into the market, the Company's shares were hammered by massive sales, sending
2   them down 52% from their Class Period high.

### LOSS CAUSATION

4     41. During the Class Period, as detailed herein, the defendants made false
5   and misleading statements and engaged in a scheme to deceive the market and a
6   course of conduct that artificially inflated the price of HP common stock and operated
7   as a fraud or deceit on Class Period purchasers of HP common stock by
8   misrepresenting the Company's business and prospects. Later, when the defendants'
9   prior misrepresentations and fraudulent conduct became apparent to the market, the
10  price of HP common stock fell precipitously, as the prior artificial inflation came out
11  of the price over time. As a result of their purchases of HP common stock during the
12  Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*,
13  damages, under the federal securities laws.

### NO SAFE HARBOR

15    42. HP's verbal "Safe Harbor" warnings accompanying its oral forward-
16  looking statements ("FLS") issued during the Class Period were ineffective to shield
17  those statements from liability.

18    43. The defendants are also liable for any false or misleading FLS pleaded
19  because, at the time each FLS was made, the speaker knew the FLS was false or
20  misleading and the FLS was authorized and/or approved by an executive officer of HP
21  who knew that the FLS was false. None of the historic or present tense statements
22  made by defendants were assumptions underlying or relating to any plan, projection or
23  statement of future economic performance, as they were not stated to be such
24  assumptions underlying or relating to any projection or statement of future economic
25  performance when made, nor were any of the projections or forecasts made by
26  defendants expressly related to or stated to be dependent on those historic or present
27  tense statements when made.

28

## CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired HP common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

45.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. HP has over 2 billion shares of stock outstanding, owned by hundreds if not thousands of persons.

46.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

       (a)    whether the 1934 Act was violated by defendants;

       (b)    whether defendants omitted and/or misrepresented material facts;

       (c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

       (d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

       (e)    whether the price of HP common stock was artificially inflated; and

       (f)    the extent of damage sustained by Class members and the appropriate measure of damages.

47.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

48.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

49.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

50.    Plaintiff incorporates ¶¶1-49 by reference.

51.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of HP common stock during the Class Period.

53.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for HP common stock. Plaintiff and the Class would not have purchased HP common stock at the prices they

paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

54.    Plaintiff incorporates ¶¶1-53 by reference.

55.    The Individual Defendants acted as controlling persons of HP within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of HP stock, the Individual Defendants had the power and authority to cause HP to engage in the wrongful conduct complained of herein.  HP controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages, including interest;

C.    Awarding plaintiff reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 13, 2011            ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                     DARREN J. ROBBINS
                                     DAVID C. WALTON
                                     CATHERINE J. KOWALEWSKI


                                     _____
                                     DAVID C. WALTON

1

2

3    655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

4    LAW OFFICES OF MARC S. HENZEL
MARC S. HENZEL

5    431 Montgomery Avenue, Suite B
Merion Station, PA  19066

6    Telephone:  610/660-8000
610/660-8080 (fax)

7    Attorneys for Plaintiff

8    S:\CptDraft\Securities\Cpt Hewlett-Packard.doc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Richard Gammel ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| August 17/2011 | 300 | 31.05 |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| | | |
| | | |
| | | |

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such

HEWLETT PACKARD

reasonable costs and expenses (including lost wages) directly relating to the representation of
the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this
12TH day of September, 2011.

RICHARD GAMMEL

HEWLETT PACKARD

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
RICHARD GAMMEL, Individually and on Behalf of All Others Similarly Situated

**DEFENDANTS**
HEWLETT-PACKARD COMPANY, LEO APOTHEKER and CATHERINE A. LESJAK

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
David C. Walton (167268)
Robbins Geller Rudman & Dowd LLP
655 W. Broadway, Ste. 1900, San Diego, CA 92101   619/231-1058

**Attorneys (If Known)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☒ Yes   ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§78j(b) and 78t(a)  Complaint for Violation of the Federal Securities Laws

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

## SACV11-01404 AG (RNBx)

**FOR OFFICE USE ONLY:**   Case Number:

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　　　☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　　　☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　　　☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)　List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐　Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Cook County, Illinois |

(b)　List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐　Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(c)　List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
　　　**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER): ～～～～～～～　Date September 13, 2011

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

Name & Address:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

RICHARD GAMMEL, Individually and on Behalf of
All Others Similarly Situated,

PLAINTIFF(S)

v.

HEWLETT-PACKARD COMPANY, LÉO
APOTHEKER and CATHERINE A. LESJAK,

DEFENDANT(S),

CASE NUMBER

**SACV11-01404 AG (RNBx)**

SUMMONS

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _David C. Walton (167268)_____, whose address is _Robbins Geller Rudman & Dowd, 655 W. Broadway, Ste. 1900, San Diego, CA 92101_. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

SEP 13 2011

Dated: _____

Clerk, U.S. District Court

By: **ROLLS ROYCE PASCHAL**

Deputy Clerk

*(Seal of the Court)*

1144

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    SUMMONS